UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


CITY OF NEW MARTINSVILLE, WEST VIRGINIA,

　　　　Plaintiff,


v.                                    Civil Action No. 2:12-1809


THE PUBLIC SERVICE COMMISSION OF WEST VIRGINIA and
MONONGAHELA POWER COMPANY and
THE POTOMAC EDISON COMPANY and
MICHAEL A. ALBERT, in his official capacity as Chairman
of the Public Service Commission of West Virginia, and
JOHN MCKINNEY, in this official capacity as Commissioner
of the Public Service Commission of West Virginia, and
RYAN B. PALMER, in his official capacity as a Commissioner
of the Public Service Commission of West Virginia,

　　　　Defendants.


MEMORANDUM OPINION AND ORDER

　　　　Pending are the motion to dismiss by defendant Public

Service Commission of West Virginia ("the Public Service

Commission" or "PSC"), filed January 25, 2013; the motion for

judgment on the pleadings by the Monongahela Power Company ("Mon

Power") and The Potomac Edison Company ("Potomac Edison" and

together with Mon Power, "the Utilities"), filed the same day[1];

and the motion to dismiss by Commissioners Michael A. Albert,

---

[1] On June 4, 2013, the Utilities filed a "Renewed Motion,"
renewing their motion as effective against the amended
complaint.  In a corresponding move on the same day, the
Commission filed a "notice of its election to stand on" its
original motion.

Chairman, Jon W. McKinney, and Ryan B. Palmer (collectively, "the Commissioners", and together with the Public Service Commission, "the Commission"), filed June 28, 2013.

The plaintiff, the City of New Martinsville, West Virginia ("the City") is a municipal corporation organized and existing under the laws of the state of West Virginia. Am. Compl. ¶ 13. The City is engaged in generating electric power from alternative energy resources which it sells to electric utilities. Id. ¶ 14, 16. The Public Service Commission is an administrative agency of the State of West Virginia, having the "authority and duty to enforce and regulate the practices, services and rates of public utilities." W. Va. Code § 24-1-1(a). Mon Power is an electric utility in West Virginia and Potomac Edison is its sister company. See Am. Compl. ¶ 19 & n.4.

## I. Background

This case arises from a dispute over ownership of alternative and renewable energy credits (commonly called "RECs," or "credits") that are a relatively recent creature of state law. Here, the credits relate to electric energy provided by the City to the Utilities under a pre-existing 1986 contract that runs until 2034, pursuant to federal law.

Congress enacted the Public Utility Regulatory Policies Act ("PURPA") in 1978, in the wake of the energy crisis of the 1970s, to promote greater use of domestic alternative and renewable energy and to decrease the nation's dependence on foreign oil.  Pub. L. No. 95-617, 92 Stat. 3117; <u>FERC v. Mississippi</u>, 456 U.S. 742, 746 (1982).  Under PURPA, certain facilities that produce electricity in nontraditional ways are designated as "qualified facilities" ("QFs").  16 U.S.C. § 824a-3.  Rulemaking power to encourage proliferation of QFs is generally held by the Federal Energy Regulatory Commission ("FERC"), while state regulatory commissions are charged with implementing[2] those rules.  16 U.S.C. 824a-3(a, f).  Under PURPA, utilities must purchase any electricity made available to them by a QF at a special price called the "avoided cost" rate.  <u>Id.</u>; 18 C.F.R. §§ 292.303-304.  The avoided cost rate is a rate equal to the costs that the utility would have incurred from generating the electricity or purchasing the electricity from another source.  16 U.S.C. § 824a-3(d); 18 C.F.R. §§ 292.101(b)(6), 292.303.  The contracts by which utilities purchase electricity supplied by a facility, whether or not it is a QF, are commonly called electric energy purchase agreements

---

[2] The contours of the state commission's power to "implement" the regulations are discussed <u>infra</u>, Part III.B, pp. 32-38.

("EEP Agreements" or "EEPAs") or power purchase agreements ("PPAs").

West Virginia is among that states that, independent of PURPA, have enacted their own laws to "encourage the development of more efficient, lower-emitting and reasonably priced alternative and renewable energy resources." W. Va. Code §§ 24-2F-1, 24-2F-2(3). West Virginia's Alternative and Renewable Energy Portfolio Act ("the W.Va. Portfolio Act" or "the Portfolio Act") was enacted in 2009, and tasks the Public Service Commission with rulemaking to "establish a system of tradable credits to establish, verify and monitor the generation and sale of electricity generated from alternative and renewable energy resources facilities." Id. § 24-2F-4(a). A "qualified facility" under PURPA is not necessarily an "alternative and renewable energy resource" facility under the Portfolio Act, and vice versa. The two classification schemes operate independently of one another and do not have the same requirements.

The Portfolio Act awards one REC to electric utilities for each megawatt hour of electricity purchased or generated from specified alternative energy resource facilities. Id. § 24-2F-4(b)(1-2). Utilities earn two RECs for each megawatt hour from specified renewable energy resource facilities. Id. § 24-

4

2F-4(b)(2).  The specified facilities include those located within West Virginia, such as the City's facility.  These state-created credits can be accumulated for use in years to come. Beginning in 2015, the Portfolio Act requires electric utilities to own RECs in amounts equal to at least 10 percent of the energy they sold to West Virginia retail customers in the preceding calendar year.  Id. § 24-2F-5(d)(1).  The requirement increases to 15 percent in 2020, and settles at 25 percent in 2025.  Id. § 24-2F-5(c), (d)(1-2).  If a utility cannot meet its requirement for a given year, the Commission will assess a per-credit penalty of at least the lesser of 200 percent of the average market value of a credit or 50 dollars.  Id. § 24-2F-5(g).  In meeting the Portfolio Act requirements, RECs may not be used more than once, but excess RECs may be carried over for use in future years.  Id. § 24-2F-5(b, f).


On November 5, 2010, the Commission issued General Order No. 184.25, setting forth final rules for the Portfolio Act.  The final rules provide that RECs may be obtained from non-utility generators of electricity from alternative and renewable resources, such as the plaintiff, the City, either by purchasing the credits and the energy bundled together or by purchasing the credits independently, unbundled from the energy. W. Va. Code R. § 150-34-5.6.

5

This dispute concerns a circumstance that the final rules do not directly address: who should own the credits when a non-utility QF sells electricity to utilities through an EEPA that predates the Portfolio Act and consequently does not specify who owns the credits?  On November 22, 2011, the Commission issued an order ("the Commission Order") that assigned the credits to the purchasing utilities.  In this case, the court is asked to consider whether the Commission violated PURPA or otherwise erred in making that determination.


A. Federal Statutory Framework

As noted, PURPA created a class of electricity generating facilities known as "qualified facilities," or "QFs". QFs include cogeneration,[3] biomass, waste, and renewable resource facilities.  See 16 U.S.C. § 824a-3.  In addition to meeting any regulatory requirements for energy output or the manner in which energy is generated, a facility must also be certified to be a QF.[4]  If a facility does not seek certification, even if it would meet all of the other requirements necessary to be a qualified

---

[3] A "cogeneration" facility is one that produces both electric energy and steam or some other form of energy useful for "industrial, commercial, heating, or cooling purposes."  16 U.S.C. § 796.

[4] There is an exception: "Any facility with a net power production capacity of 1 MW or less is exempt from the filing requirements."  18 C.F.R. § 292.203(d).

facility, it is not a "qualified facility" under the
regulations.  A facility may either file a notice of self-
certification with FERC or apply directly to FERC for
certification.  18 C.F.R. § 292.203.  Whether to seek QF
certification is up to the facility, as no part of PURPA or the
FERC regulations requires an otherwise qualified facility to do
so.  See generally 16 U.S.C. §§ 824-824a-3; 18 C.F.R. §§
292.101-292.602.  The plaintiff's Hannibal Project is a
qualified facility under PURPA.

To encourage the development of QFs, PURPA obligates
electric utilities to buy any electricity made available by a QF
at the avoided cost rate.  The QF may sell power on an "as
available" basis, in which case the purchasing utility will buy
at the avoided cost rate at the time of purchase.  18 C.F.R. §
292.304(d)(1).  Alternatively, the QF can enter into a contract
with a utility (known as EEPAs or PPAs), where the price may be
either the avoided cost at the time of contracting or the
avoided cost at the time of delivery.  18 C.F.R. §
292.304(d)(2).

PURPA directs the Federal Energy Regulatory Commission
("FERC") to prescribe "such rules as it determines necessary to
encourage cogeneration and small power production."  PURPA
§ 210(a), 16 U.S.C. § 824a-3(a).  Section 210(f), headed

7

"Implementation of rules for qualifying cogeneration and qualifying small power production facilities," then directs "each State regulatory authority" to "implement such [FERC] rule (or revised rule) for each electric utility for which it has ratemaking authority." Id. § 210(f), 16 U.S.C. § 824a-3(f).

PURPA § 210(e) instructs FERC to prescribe rules exempting qualifying facilities from certain federal and state utility regulation, including "State laws and regulations respecting the rates, or respecting the financial or organizational regulation, of electric utilities." 16 U.S.C. § 824a-3(e); see also Wheelabrator Lisbon, Inc. v. Conn. Dept. of Pub. Util. Ctr., 531 F.3d 183, 185 n.7 (2d Cir. 2008). FERC regulations accordingly provide, that any QF is "exempted . . . from State laws or regulations respecting: (i) The rates of electric utilities; and (ii) The financial and organizational regulation of electric utilities." 18 C.F.R. § 292.602(c). The exemption "is referred to as the 'exempt[ion] from . . . utility-type . . . regulation.'" Wheelabrator, 531 F.3d at 185 n.7 (quoting Freehold Cogeneration Assocs., L.P. v. Bd. of Reg. Comm'rs of N.J., 44 F.3d 1178, 1185 (3d Cir. 1995)).

In Freehold, the Third Circuit concluded that a state regulatory agency had impermissibly modified an EEPA by ordering the QF and utility to renegotiate the agreement's purchase rate

8

terms.  44 F.3d at 1190.  The court observed that PURPA reserves for FERC, not state regulators, the responsibility of regulating the rates at which electricity is purchased under EEPAs.  Id. at 1191.  PURPA gives state regulatory agencies the authority to review and approve EEPAs with a QF as a party, but once an EEPA is approved, modification of the EEPA or revocation of the approval of an EEPA constitutes "utility-type" regulation of the QF, in violation of § 210(e).  Id. at 1191-92.


B. Ownership of RECs for Electricity Sold Under Preexisting EEPAs

Previous disputes have arisen regarding whether the generator or the electric utility should own the RECs associated with EEPAs that predate the relevant state portfolio act.  In 2003, FERC issued a decision declaring that REC ownership in the context of preexisting PURPA EEPAs is a matter to be decided by the states under state law.  American Ref-Fuel Co., 105 F.E.R.C. ¶ 61,004 (2003).  In American Ref-Fuel, FERC considered a petition from owners of several QFs seeking a declaratory judgment that PURPA EEPAs compensate QFs only for energy and capacity, not for any "environmental attributes," and therefore should not "inherently convey to the purchasing utility any renewable energy credits."  105 F.E.R.C. ¶ 61,005, at ¶ 2.  FERC granted the petition to the extent that it sought a declaration that FERC's "avoided cost regulations did not contemplate the

existence of RECs and that the avoided cost rates for capacity and energy sold under contracts entered into pursuant to PURPA do not convey the RECs, in the absence of an express contractual provision." Id. ¶ 61,006, at ¶ 18.  FERC concluded that "[w]hile a state may decide that a sale of power at wholesale automatically transfers ownership of the state-created RECs, that requirement must find its authority in state law, not PURPA." Id. ¶ 61,007, at ¶ 24.

The Second Circuit considered the issue in Wheelabrator Lisbon.  531 F.3d at 190.  There, the plaintiff, a QF, had challenged a ruling by the Connecticut Department of Public Utility Control ("DPUC") that the parties' EEPA "conveyed to [the utility, Connecticut Light and Power,] any RECs arising from" the production of its subject electricity.  Id. at 187. The plaintiff argued that DPUC's ruling "modified the terms of the [EEPA] and thereby imposed utility-type regulation in conflict with Section 210(e) of [PURPA]." Id. at 185.

The Second Circuit agreed with the district court that DPUC's interpretation of the EEPA with respect to ownership of RECs did not constitute a modification of the EEPA:

> As the District Court explained, "the DPUC decisions are unlike the [state agency] order that was the subject of Freehold." Unlike the New Jersey agency in Freehold, "the DPUC has not ordered the [qualifying facility] to renegotiate the contract purchase price or ordered lower

rates.  Rather, the DPUC considered the [energy purchase
agreement] at issue and concluded that [it] transferred the
renewable energy and the associated GIS Certificates to CL
& P."  We agree that the DPUC did not order the
renegotiation of the terms of the Agreement but simply
exercised its authority to interpret the Agreement's
provisions -- as it happens, in a manner that was
unfavorable to Wheelabrator.  We hold, therefore, that the
2004 DPUC Decision does not modify the terms of the
Agreement and, accordingly, does not violate Section 210(e)
of PURPA.

Id. at 188-89.


     The Second Circuit also found that FERC's decision in

American Ref-Fuel did not preempt DPUC's decision.  The

plaintiff had argued that American Ref-Fuel required "RECs to be

sold through express contractual provisions and that, in the

absence of such a provision, an electricity purchase agreement

cannot convey RECs."  Id. at 189.  The court disagreed, again

adopting the lower court's reasoning:

     We agree with the District Court, and with FERC, that
     American Ref-Fuel did not impose such a rule.  As the
     District Court correctly observed:

          [In American Ref-Fuel,] [t]he FERC concluded that RECs
          are created by the State and controlled by state law, not
          PURPA, and that they may be decoupled from the renewable
          energy . . . .  Taken as a whole, however, American Ref-
          Fuel does not stand for the proposition that PURPA
          requires an express contractual provision in order for
          RECs . . . to be transferred to a public utility pursuant
          to a PURPA contract . . . .  In its order denying
          rehearing, the FERC noted that the reference to an
          "express contractual provision" seems to have been
          misunderstood.  The FERC elaborated: "We did not mean to
          suggest that the parties to a PURPA contract, by
          contract, could undo the requirements of State law in
          this regard.  All we intended by this language was to
          indicate that a PURPA contract did not inherently convey

11

> any RECs, and correspondingly that, assuming State law
> did not provide to the contrary, the [qualifying
> facility] by contract could separately convey the RECs."

> In sum, the FERC decision in American Ref-Fuel does not
> evince an intent to occupy the relevant field -- namely,
> the regulation of renewable energy credits.  Rather, it
> explicitly acknowledges that state law governs the
> conveyance of RECs.  We conclude, therefore, that the
> American Ref-Fuel does not preempt the 2004 DPUC Decision.

Id. at 189-90 (internal citations omitted).


New Jersey and Pennsylvania state courts have also
considered the issue and concluded that state regulatory
authorities did not run afoul of PURPA by decreeing ownership of
RECs to utilities absent a contrary contractual provision.  See
ARIPPA v. Pa Pub. Util. Comm'n, 966 A.2d 1204, 1209 (Pa. Commw.
Ct. 2009); In re Ownership of Renewable Energy Certificates
("Ownership of RECs"), 913 A.2d 825, 828, 830 (N.J. Super. Ct.
App. Div. 2007).  In Ownership of RECs, a New Jersey state court
found that certain language in American Ref-Fuel "might be
construed as helpful to appellants," who were QFs, but that "the
balance" of that opinion supported the regulator's decision that
the RECs belonged to the utility.  913 A.2d at 831.  It
concluded that "according to FERC, states decide who owns the
REC in the initial instance."  Id.  In ARIPPA, a Pennsylvania
state court similarly found that the Pennsylvania Public Utility
Commission "has not modified the terms of an existing and
approved contract, but rather has determined ownership of assets

which were not contemplated, let alone provided for in the contracts at issue."  966 A.2d at 1209.


C. Factual and Procedural Background

        Plaintiff, the City, owns and operates both a municipal electrical system serving approximately 1,800 customers and a run-of-river hydropower facility known as the Hannibal Project.  Am. Compl. ¶ 14.  As earlier noted, the Hannibal Project is a qualified facility under PURPA.  Id. ¶ 22. On April 1, 1986 the City and Mon Power entered into a long-term EEPA ("electric energy purchase agreement"), whereby Mon Power has purchased energy and capacity generated at the Hannibal Project.  Id. ¶ 19.[5]  The EEPA is in effect until 2034.  Id.


        The Portfolio Act requires both the City and Mon Power, as electrical utilities, to own a certain amount of RECs. Id. ¶¶ 34-35.  The City's Hannibal Project, which has been certified as a qualified renewable energy resource facility under the Portfolio Act, provides one source of credits.  Id. ¶ 29.  The EEPA and a 2004 Amendment between Mon Power and the City, however, are silent regarding which entity owns the

---

[5] While Mon Power executed the EEPA, "the Commission now regulates the combined West Virginia operations of Mon Power and [Potomac Edison] as a single entity, including the combined costs and rates."  City of New Martinsville v. Pub. Serv. Comm'n of W. Va., 729 S.E.2d 188 n.6 (W. Va. 2012).

credits the Hannibal Project generates.  Id. ¶ 36.
Consequently, Mon Power and the City, on December 30, 2010 and
January 3, 2011, respectively, have both submitted Portfolio
Standard Compliance Plans that claimed ownership of the Hannibal
RECs.  Id. ¶¶ 37-38.


        1. The Commission Order

        On February 23, 2011, the Utilities filed a petition
for declaratory relief with the Commission, requesting a ruling
that the Utilities were entitled to W.Va. Portfolio Act RECs
attributable to three non-utility QFs: (1) the Hannibal project,
(2) a facility owned by Morgantown Energy Associates ("MEA"),
(3) and the Grant Town Project.[6]  Id. ¶ 39 & n.9.  On March 4,
2011, the City filed a Petition to Intervene and Response in
Opposition to the Petition for Declaratory and Interim Relief,
and the Commission thereafter granted intervenor status to the
City.

---

[6] The second of these facilities is the subject of concurrent
litigation before this court as Morgantown Energy Associates v.
Public Service Commission of West Virginia, No. 2:12-cv-6327.
The owner of the other project, the Grant Town Project, was not
a party to the proceedings before the Commission.  Am. Compl. ¶
39 n.9.

On November 22, 2011, the Commission issued an order (the "Commission Order") resolving the following two issues in the affirmative:

> 1.  Whether, under EEPAs that predate the Portfolio Act and Commission <u>Portfolio Standard Rules</u> and that are silent on the issue of credit ownership, [the Utilities] or the QFs own the credits associated with QF generation; and,
>
> 2.  If the utilities own and are entitled to credits from the facilities, whether the Commission has the jurisdiction and authority to order a QF to certify the facilities or to deem the facilities certified to generate credits under the <u>Portfolio Standard Rules</u> . . . .

Comm'n Order 10.

At the outset, the Commission noted that the Utilities estimate the cost of "acquir[ing] additional compliance credits to replace" the credits generated by the City and the other two facilities to be "approximately $50 million through 2025." <u>Id.</u> The Commission later refers to this as a "conservative cost estimate." <u>Id.</u> at 32.

The Commission determined that the Utilities own the credits based on "three separate but interrelated bases":

> (i) consistent with the [Portfolio] Act, the utility that is obligated to purchase PURPA generation (which also qualifies as eligible generation under the Portfolio Act) should own the credits that exist for the purpose of measuring utility compliance with the portfolio standard, (ii) [the Utilities'] ownership of the credits is based on their ownership of the qualifying energy as it is generated, and (iii) under the circumstances of the case in which the Portfolio Act and the EEPAs do not contain provisions that specify credit ownership by the utility or

the QF, it is appropriate to consider equity and fairness and the impact of our decision on utility rates in determining credit ownership under the EEPAs based on the provisions of W.Va. Code § 24-2F-1 et seq. that require that the costs associated with the [Portfolio] Act are reasonable and the provisions of Chapter 24 of the West Virginia Code that require the Commission to ensure fair and reasonable rates and to balance the interests of the current and future utility customers, the utilities and the state economy.

Id. at 43.


        The Commission concluded that:


    It would be unreasonable to require the utility to purchase, and ratepayers to pay the additional cost of credits, to verify the purchases of PURPA generation that the utility has purchased and will continue to purchase which qualifies as eligible generation under the Portfolio Act.

    [] In the absence of an express statutory provision governing the issue of credit ownership under PURPA EEPAs that predate the Portfolio Act and that are silent on the issue of credit[] ownership, the credits under the PURPA EEPAs are owned by the electric utility, Mon Power and PE, not the QFs, consistent with the intent and mandates of the Act and principles of equity and fairness.

Id. at 55.


        The Commission expressly disavowed any reliance on

federal law: "The Commission is not modifying the existing PURPA

Agreements or exercising utility-type jurisdiction over MEA; we

are determining the ownership of the credits in light of state

law." Id. at 37.  It made the following conclusions respecting

the EEPAs:

17.  When the three EEPAs in question were negotiated and approved by the Commission, the statutory created credits did not exist and the retention of the credits was not a part of the contract and agreement between the parties. The PURPA facilities received what they bargained for, and all that they were entitled to, when agreements were finalized setting forth the avoided cost rates and terms that would apply to the final EEPAs.

18.  By the very nature of the PURPA EEPAs, no additional consideration is contemplated or needed other than the substantial consideration that the projects received and that is not usually available to merchant power generators.

Id. at 54.

In December 2011, the City and MEA filed appeals of the Commission Order with the West Virginia Supreme Court of Appeals, which the high court subsequently consolidated. Am. Compl. ¶ 46.

2. The April FERC Order

On March 15, 2012, while the state appeal was pending, the City petitioned FERC to bring an enforcement action against the Commission to require compliance with PURPA. Id. ¶ 65. The petition asserted, among other things, that the Commission Order is contrary to PURPA's regulations because it (1) violates FERC's determination that the avoided cost rates compensate QFs only for capacity and energy and not for environmental attributes, (2) makes an impermissible post hoc adjustment to the EEPA avoided cost rate, and (3) discriminates against the City based on its QF status under PURPA in setting electricity

17

rates, in violation of 16 U.S.C. §824a-3(b)(2) and 18 C.F.R. § 292.304(a)(1), because the Commission purportedly does not also deem RECs generated by a facility that is not qualified under PURPA to be owned by the utility to which the facility sells power. Id. ¶ 67.

On April 24, 2012, FERC issued a Notice of Intent Not to Act and Declaratory Order that applied to both the City's petition and a separate petition lodged by MEA. FERC declined to exercise its discretionary enforcement authority under § 210(h) of PURPA. Morgantown Energy Associates (Morgantown I), 139 F.E.R.C. ¶ 61,066, at ¶ 44-45 (2012). It quoted from and reiterated its holding in American Ref-Fuel:

> [FERC] has recognized that PURPA does not address the ownership of RECs and that states have the authority to determine ownership of RECs in the initial instance, as well as how they are transferred from one entity to another.

Id. ¶ 46. It further explained the rationale behind American Ref-Fuel, stating that the rates at which the utilities must purchase power from QFs "must be just and reasonable to the electric customer of the public utility and in the public interest," but an electric utility is not required to pay the QF more than the avoided cost. Id. ¶ 47.

Nonetheless, FERC found that "certain statements in the [Commission] Order are inconsistent with PURPA." Id. ¶ 45. FERC concluded that "[t]o the extent that the [Commission] Order finds that avoided-cost rates under PURPA also compensate for RECs, the [Commission] Order is inconsistent with PURPA." Id. ¶ 47. In a footnote, FERC further explains the perceived inconsistency:

> The West Virginia Order relies primarily on the avoided cost rate in the contract[] . . . between the City of New Martinsville and Monongahela Power as justification for finding that the RECs produced by the QFs are owned by the purchasing utility in the first instance. See, e.g., West Virginia Order at 28-31. For example, the West Virginia Order states that avoided cost rate contracts under PURPA provide a substantial consideration to the QF sufficient to compensate not only for the energy and capacity contemplated in the contracts, but also for the RECs produced by the QFs. See West Virginia Order at 28.

Id. ¶ 47 n.68.


Under PURPA, when FERC declines to bring an enforcement action within 60 days of the filing of a petition, the petitioner may bring its own enforcement action against the state regulatory authority in the appropriate U.S. district court. 16 U.S.C. § 824a-3(h)(2)(B). Pursuant to that provision, the City filed the present action on June 1, 2012.

3. The Appeal to the West Virginia Supreme Court

On June 11, 2012, shortly after the City filed the present action, the West Virginia Supreme Court of Appeals affirmed the Commission Order in full in New Martinsville v. Public Service Commission of West Virginia, 729 S.E.2d 188 (W. Va. 2012).  The court held,

> [T]he Commission has not modified the terms of the existing EEPAs but, instead, has only determined ownership of assets -- the credits -- which were not contemplated and, thus, not provided for in the EEPAs.

Id. at 196.  It further explained,

> [T]he Commission considered the EEPAs and concluded that because the Utilities own the electricity as it is generated, they also own the credits which only come into existence after the electricity is generated.
>
> * * *
>
> Thus, in reaching its decision, the Commission has only interpreted the EEPAs to evaluate the Utilities' obligations under them and their ownership of the electricity at the time it is generated.  The Commission has not interfered with the Generators' federally granted right to be exempt from certain utility-type state regulation.

Id. 196-97.


The court found that the April FERC order "ha[d] no bearing upon" the appeal before it.  Id. at 199 n.15. Consequently, the court disagreed with FERC's concerns and "concluded that the Commission's decision is not inconsistent with PURPA but, rather, is a well-reasoned decision based upon our state law."  Id.

4. The September FERC Order

On May 6, 2012, the Utilities filed with FERC a
request for clarification or, alternatively, a motion for
rehearing of FERC's April Order.  Morgantown Energy Associates
(Morgantown II), 140 F.E.R.C. ¶ 61,223, at ¶ 3 (2012).  The
Utilities claimed that the order did not identify which
statements in the Commission order were inconsistent with PURPA,
and that FERC erred in determining that the Commission Order
found that avoided cost rates compensate the QF for both RECs
and energy.  Id.  On September 20, 2012, FERC issued an order
denying a request by the Utilities for reconsideration of its
April order.  Id. ¶ 1.  FERC acknowledged the Supreme Court of
Appeals affirmance, but did not comment on its substance,
instead focusing on the Commission Order.  Id. ¶ 14 & n.34.  In
the September order FERC explained its concerns regarding one of
the perceived rationales for the Commission's decision:

> While the [Commission] Order may also identify other bases
> for its decision to find that RECs produced by QFs belong
> to the purchasing utility, we cannot ignore those portions
> of the [Commission] Order that clearly refer to the avoided
> cost rate under PURPA as justification for its finding that
> RECs produced by QFs belong to the purchasing utility in
> the first instance.  It is likewise significant, we find,
> that the West Virginia Commission implied that RECs
> produced by non-QFs could be considered to be owned by the
> non-QF generator in the first instance rather than the
> first purchaser of the output of the non-QF generator.  The
> only reasonable reading of the [Commission] Order is that
> the West Virginia Commission's finding that the RECs
> produced by QFs, as opposed to RECs produced by non-QFs,
> are owned by the purchasing utilities in the first instance

21

is based on the West Virgnia Commission's belief that the PURPA avoided cost rates are overly generous and therefore must include RECs.

Id. ¶ 21.  It continued,

> We note . . . that the West Virginia Commission did not find the sale of power at wholesale automatically transfers RECs.  Instead, the West Virginia Commission found that RECs produced by QFs are owned by the purchasing utility (while RECs produced by non-QFs are not); and the West Virginia Commission clearly based this finding on its expressly stated belief that avoided cost rates were overly generous to utilities and unfair to consumers.  Under these circumstances it is clear that to this extent, at least, the West Virginia Order is inconsistent with the Commission's ruling in American Ref-Fuel that avoided cost rates "in short, are not intended to compensate the QF for more than capacity and energy."

Id. (quoting Am. Ref-Fuel, 105 F.E.R.C. ¶ 61,004, at ¶ 22).


The order then makes clear that FERC's criticism is limited to the rationale perceived by it in the Commission Order, not the Commission's actual decision to assign credits to the utilities:

> Because the ownership of the RECs is a matter of West Virginia law, we are not dictating to West Virginia whether a generator or the electric utility purchasing capacity and energy from the generator should own RECs at their creation.  Rather, we merely find that the West Virginia Commission cannot, consistent with PURPA, assign ownership of the RECs to the Utilities on the grounds that the avoided cost rates in their PURPA [agreements] compensate the QFs for RECs in addition to energy and capacity.

Id. ¶ 24.  In addition, FERC acknowledged that the Commission Order rested on other justifications as well: (1) that "it is unreasonable to retroactively apply [the unbundling provision, Portfolio Standard Rule 5.6] to PURPA [EEPAs] entered into prior

22

to the rule's effective date," and (2) that "because RECs are a tool for ensuring that electric utilities purchase energy that satisfies their renewable portfolio standard obligations, RECs are not necessary in the presence of PURPA [EEPAs] because PURPA [EEPAs] perform the same function as RECs." Id. ¶ 21 n. 45. Ultimately, FERC denied the request, rejecting the Utilities' arguments for reconsideration. Id. ¶ 26.

### 5. Federal District Court

As noted above, the City filed the present action on June 1, 2012, naming only the Public Service Commission as the defendant.

On December 21, 2012, the court granted the Utilities' Rule 24(a) motion to intervene as party defendants. On January 25, 2013, the Commission filed its pending motion to dismiss under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(c),[7] and the Utilities filed their motion for judgment on the pleadings under Rule 12(c).

The City filed an amended complaint ("the complaint") on May 21, 2013, joining the individual Commissioners as

---

[7] A motion under Rule 12(c) is for judgment on the pleadings, not for judgment through dismissal. The Commission's motion, however, is styled as a "motion to dismiss" under rule 12(c).

defendants.  On June 4, 2013, the Utilities filed a "Renewed Motion," renewing their original motion as effective against the amended complaint.  In a corresponding move on the same day, the Commission itself filed a "notice of its election to stand on" its original motion.  On June 28, 2013, the individual Commissioners filed their motion to dismiss under Rule 12(b)(1) and 12(b)(6), incorporating each of the arguments made by the Commission in its motion to dismiss.[8]

The complaint asserts two counts, each seeking a declaratory order and injunctive relief.  Count I asserts that the Commission, by issuing the Commission Order, has failed to implement PURPA and FERC's regulations.  Count II claims that the Commission Order is preempted by the federal scheme of regulation under PURPA § 210(f).

In their motions, the defendants assert that federal jurisdiction is barred by the Rooker-Feldman doctrine.  They also contend that this action is not properly before this court because it is not a challenge to the Commission's "implementation" of PURPA, but rather an "as applied" challenge.

---

[8] As a result, throughout the "Commission" refers to the Public Service Commission and the Commissioners, collectively, except where otherwise noted.

They further argue that the court should abstain from adjudicating the controversy under various abstention doctrines.

Should the court recognize jurisdiction and decline to abstain, the defendants maintain that preclusion principles require it to honor the state decisions granting credit ownership to the electric utilities.  Alternatively, the Commission contends that it is immune from the City's suit based on sovereign immunity pursuant to the Eleventh Amendment of the United States Constitution.  Finally, the Utilities argue that the City's claims fail to state any claim upon which relief may be granted.

## II. Governing Standard

Under Federal Rule of Civil Procedure 8(a)(1), a complaint must contain "a short and plain statement of the grounds for the court's jurisdiction."  Rule 12(b)(1) correspondingly permits a defendant to assert, by motion, that the plaintiff's claim for relief fails for "lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  The plaintiff has the burden of proving that subject matter jurisdiction exists.  Evans v. B.F. Perkins, Co., 166 F.3d 642, 647 (4th Cir. 1999).  "When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), 'the district court is to regard the pleadings as mere evidence on the issue, and may consider

25

evidence outside the pleadings without converting the proceeding to one for summary judgment.'" Id. (quoting Richmond, Fredericksburg & Potomac R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991)).  The court "should grant the Rule 12(b)(1) motion to dismiss 'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'"  Id. (quoting Richmond, 945 F.2d at 768).

Under Rule 8(a)(2), the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

The required "short and plain statement" must provide "'fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); see also Anderson v. Sara Lee Corp., 508 F.3d 181, 188 (4th Cir. 2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570); see also Monroe v. City of Charlottesville, 579 F.3d 380,

26

386 (4th Cir. 2009). Facial plausibility exists when the court is able "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556). The plausibility standard "is not akin to a 'probability requirement,'" but it requires more than a "sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556).

In assessing plausibility, the court must accept as true the factual allegations contained in the complaint, but not the legal conclusions. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The determination is "context-specific" and requires "the reviewing court to draw on its judicial experience and common sense." Id. at 679.

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed -- but early enough not to delay trial -- a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A Rule 12(c) motion "is assessed under the same standard that applies to a Rule 12(b)(6) motion." Walker v. Kelley, 589 F.3d 127, 139 (4th Cir. 2009); Independence News, Inc. v. City of Charlotte, 568 F.3d 148, 154 (4th Cir. 2009) (citing Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)).

III. Discussion

A. The Rooker-Feldman Doctrine

The defendants argue that the Rooker-Feldman doctrine bars this court's jurisdiction. The United States Supreme Court holds that the doctrine "recognizes that 28 U.S.C. § 1331 is a grant of original jurisdiction, and does not authorize district courts to exercise appellate jurisdiction over state-court judgments, which Congress has reserved to this Court." Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 644 n.3 (2002). It is named for the only two Supreme Court cases in which it has been applied: Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923), and Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983). See Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 283 (2005).

In Exxon Mobil, the Supreme Court warned that lower courts had at times applied the doctrine "far beyond the contours of the Rooker and Feldman cases, overriding Congress' conferral of federal-court jurisdiction concurrent with jurisdiction exercised by state courts, and superseding the ordinary application of preclusion law pursuant to 28 U.S.C. § 1738." 544 U.S. at 283. The Court clarified that the doctrine is limited to "cases brought by state-court losers

28

complaining of injuries caused by state-court judgments rendered
before the district court proceedings commenced and inviting
district court review and rejection of those judgments."  <u>Id.</u> at
284.


        It added that the <u>Rooker-Feldman</u> doctrine does not
become applicable "simply because a party attempts to litigate
in federal court a matter previously litigated in state court."
<u>Id.</u> at 293.  The federal district court still has jurisdiction
if the case before it "'present[s] some independent claim'" even
if that claim "'denies a legal conclusion that a state court has
reached in a case to which [the plaintiff] was a party.'"  <u>Id.</u>
(quoting <u>GASH Assocs. v. Rosemont</u>, 995 F.2d 726, 728 (7th Cir.
1993)).  Thus, in <u>Exxon Mobil</u>, the Court declined to apply
<u>Rooker-Feldman</u> where the plaintiff did not "repair[] to federal
court to undo the [state court] judgment in its favor" but
rather "filed suit in Federal District Court . . . to protect
itself in the event it lost in state court on grounds (such as
the state statute of limitations) that might not preclude relief
in the federal venue."  <u>Id.</u> at 293-94.


        Discussing the impact of <u>Exxon Mobil</u>, our court of
appeals explained,

        Whereas [before <u>Exxon</u>] we examined whether the state-court
        loser who files suit in federal court is attempting to
        litigate claims he either litigated or could have litigated

before the state court, <u>Exxon</u> requires us to examine
whether the state-court <u>loser</u> who files suit in federal
district court seeks redress for an injury caused by the
state-court decision itself. If he is not challenging the
state-court decision, the <u>Rooker-Feldman</u> doctrine does not
apply.

<u>Davani v. Virginia Department of Transportation</u>, 434 F.3d 712,

718 (4th Cir. 2006) (footnote omitted) (permitting a federal

employment discrimination and retaliation action following the

state court's refusal to overturn the plaintiff's grievance with

the employer). It borrowed this example from the Second

Circuit:

Suppose a plaintiff sues his employer in state court for
violating . . . anti-discrimination law and . . . loses.
If the plaintiff then brings the same suit in federal
court, he will be seeking a decision from the federal court
that denies the state court's conclusion that the employer
is not liable, but he will not be alleging injury from the
state judgment. Instead, he will be alleging injury based
on the employer's discrimination. The fact that the state
court chose not to remedy the injury does not transform the
subsequent federal suit on the same matter into an appeal,
forbidden by <u>Rooker-Feldman</u>, of the state-court judgment.

<u>Id.</u> at 719.

The Supreme Court further emphasized the doctrine's

limits in <u>Lance v. Dennis</u>, decided the term following <u>Exxon</u>

<u>Mobil</u>:

Neither <u>Rooker</u> nor <u>Feldman</u> elaborated a rationale for a
wide-reaching bar on the jurisdiction of lower federal
courts, and our cases since <u>Feldman</u> have tended to
emphasize the narrowness of the <u>Rooker-Feldman</u> rule. See
<u>Exxon Mobil</u>, 544 U.S., at 292, 125 S.Ct. 1517 (<u>Rooker-
Feldman</u> does not apply to parallel state and federal
litigation); <u>Verizon Md. Inc. v. Public Serv. Comm'n of
Md.</u>, 535 U.S. 635, 644, n. 3, 122 S.Ct. 1753, 152 L.Ed.2d
871 (2002) (<u>Rooker-Feldman</u> "has no application to judicial

> review of executive action, including determinations made
> by a state administrative agency"); Johnson v. De Grandy,
> 512 U.S. 997, 1005–1006, 114 S.Ct. 2647, 129 L.Ed.2d 775
> (1994) (Rooker-Feldman does not bar actions by a nonparty
> to the earlier state suit).  Indeed, during that period,
> "this Court has never applied Rooker-Feldman to dismiss an
> action for want of jurisdiction."  Exxon Mobil, supra, at
> 287, 125 S.Ct. 1517.

546 U.S. 459, 464 (2006).  Particularly relevant to this case is

the admonition that "[t]he doctrine has no application to

judicial review of executive action, including determinations

made by a state administrative agency."  Verizon Md., 535 U.S.

at 644 n.3.


        The facts in Verizon Maryland were somewhat analogous

to those here.  Pursuant to the Telecommunications Act of 1996,

the Maryland Public Service Commission had approved an

"interconnection agreement" and "reciprocal compensation

arrangement" through which Verizon would share its network with

WorldCom and other competitors.  Id. at 638-39.  Sometime

thereafter, Verizon informed WorldCom that it would no longer

pay for certain calls which it contended were not subject to the

interconnection agreement.  Id.  WorldCom filed a complaint with

the commission challenging Verizon's claim, and the commission

found in favor of WorldCom.  Id.  On appeal, a Maryland state

court affirmed the order.  Id.

Verizon then filed an action in federal district court, alleging that the commission's ruling violated the 1996 Act and a later FCC determination.  Id. at 640.  The district court dismissed the action, and the Fourth Circuit affirmed on immunity grounds.  Id.  On appeal to the Supreme Court, the commission suggested that Rooker-Feldman should have precluded federal jurisdiction.  The Court dismissed the argument in a footnote, stating that Rooker-Feldman limits jurisdiction "over state-court judgments" and therefore does not apply "to judicial review of executive action, including determinations made by a state administrative agency."  Id. at 644 n.3.


This court finds the Rooker-Feldman doctrine likewise inapplicable to the City's claims.  The City has not brought a direct challenge to the West Virginia Supreme Court's judgment. The City is challenging the Commission's ruling regarding credit ownership, a determination by a state administrative agency, just as in Verizon Maryland.  While the federal challenge may "deny" the West Virginia Supreme Court's legal conclusion that the Commission Order is consistent with PURPA, that denial does not make this action a challenge to a state court judgment.  See Exxon Mobil Corp., 544 U.S. at 293.

B. Statutory Jurisdiction Under PURPA

The defendants also assert that this case does not challenge the Commission's "implementation" of FERC rules for electric utilities, and consequently fails to qualify for PURPA's statutory grant of jurisdiction to federal district courts.  <u>See</u> PURPA § 210(f, h), 16 U.S.C. § 824a-3(f, h).


Section 210 of PURPA provides the mechanism though which qualifying facilities can bring an action in federal district court.  As discussed above, § 210(f) concerns the "[i]mplementation of rules for qualifying cogeneration and qualifying small power production facilities" and requires "each State regulatory authority" -- in this case, the Commission -- to "implement such rule (or revised rule) for each electric utility for which it has ratemaking authority."  <u>Id.</u>  The implementation must occur "on or before the date one year after" FERC prescribed the rule.  <u>Id.</u>  If the regulatory authority fails to implement the FERC rules, § 210(h) provides that "[a]ny electric utility, qualifying cogenerator, or qualifying small power producer may petition [FERC] to enforce the requirements of subsection (f)."  <u>Id.</u> § 824a-3(h)(2)(B).  If FERC declines to bring an enforcement action, § 210(h) then authorizes the electric utility, qualifying cogenerator, or qualifying small power producer to bring an action against the state regulatory

authority in "the appropriate United States district court."
Id.


The City's complaint expressly provides § 210(h) as
the basis for this court's jurisdiction for claims against the
Commission arising under PURPA.  Am. Compl. ¶ 2.  The
defendants, however, contend that this lawsuit does not relate
to the Commission's "implementation" of FERC rules because the
initial assignment of RECs is controlled by state law, not by
PURPA.  They consequently assert that this court lacks
jurisdiction under § 210(h) to review the Commission Order.


The court believes its exercise of jurisdiction is
proper in this instance.  While Wheelabrator and American Ref-
Fuel conclude that state regulatory agencies' assignment of RECs
is a matter of state law, these opinions do not stand for the
further position that the assignment of state credits can never
result in a violation of PURPA.  Consistent with those opinions,
a state commission would violate PURPA by assigning credits in a
way that directly modifies EEPAs, that is, by ruling that the
EEPAs "inherently convey" the credits.  Am. Ref-Fuel, 105
F.E.R.C. ¶ 61,005.  That is what the City alleges has happened
in this case.

FERC, in somewhat qualified language, appears to agree with the City, and though it declined to initiate an enforcement action, FERC expressly stated that the City "may bring its own enforcement action . . . in the appropriate United States district court."  139 F.E.R.C. ¶ 61,066 at ¶ 45.  The Commission argues that the court is not obligated to follow a FERC order.  See Xcel Energy Servs., Inc. v. FERC, 407 F.3d 1242, 1244 (D.D.C. 2005) ("An order that does no more than announce [FERC's] interpretation of the PURPA or one of the agency's implementing regulations is of no legal moment unless and until a district court adopts that interpretation when called upon to enforce the PURPA.").  While that may be, close scrutiny of FERC's conclusions is inappropriate in the context of a jurisdictional inquiry, and the court, accordingly, takes FERC's conclusions at face value as support for jurisdiction.  See Hartley v. CSX Transp., Inc., 187 F.3d 422, 425 (4th Cir. 1999) ("[A] jurisdictional inquiry is not the appropriate stage of litigation to resolve these various uncertain questions of law and fact.  . . .  To permit extensive litigation of the merits of a case while determining jurisdiction thwarts the purpose of jurisdictional rules.").

Section 210 gives this court jurisdiction over challenges to PURPA implementation, and this is such a challenge.  Whether it is also a fruitful challenge should not

be determined within the threshold jurisdictional inquiry.  The
court concludes that jurisdiction is proper and leaves
consideration of American Ref-Fuel for the discussion of the
City's specific claims.


          The court does not believe that "implementation" for
purposes of PURPA is limited to the Commission's initial
implementation of West Virginia PURPA program in 1981.  See
Utilities's Mem. Supp. J. Pleadings 13.  A 1983 FERC policy
statement clarifies that implementation enforcement under § 210
extends to state regulatory authorities that "completed the
implementation process, but have promulgated regulations which
are inconsistent with or contrary to [FERC's] regulations."
Policy Statement Regarding the Commission's Enforcement Role
Under Section 210 of the PURPA ("Policy Statement"), 23 F.E.R.C.
¶ 61,304, at ¶ 61,644 (1983).  The policy statement continues:
"Thus, for example, an allegation that a State regulatory
authority had promulgated regulations which include a purchase
rate standard contrary to [FERC] regulations would properly lie
before [FERC] or before a judicial forum of proper
jurisdiction."  Id.; see also Occidental Chem. Corp. v. La. Pub.
Serv. Comm'n, 494 F. Supp. 2d 401, 409 (M. D. La. 2007)
("Federal jurisdiction under § 210(h) exists whenever a state
regulatory authority has adopted requirements that 'include a
purchase rate standard contrary to existing [FERC]

regulations.'" (quoting Policy Statement, 23 F.E.R.C. at
¶ 61,644)).  Section 210 "implementation" actions are not
limited to the review of a regulatory authority's initial
implementation.  If the Commission Order modified the EEPA
purchase rates contrary to FERC regulations, as the City
alleges, then the Commission has failed to implement PURPA.


        The court likewise disagrees with the defendants'
related contention that the complaint can "[a]t best" be
construed as an "as applied" challenge.  Comm'n's Reply Pl.'s
Resp. Mot. Dismiss 14-15; see also Utilities' Mem. Supp. Mot. J.
Pleadings 14.  As one court explained,

> An implementation claim . . . involves a contention that
> the state agency has failed to implement a lawful
> implementation plan under § 210(f) of PURPA.  An as-applied
> claim, in contrast, involves a contention that the agency's
> implementation plan is unlawful, as it applies to or
> affects an individual petitioner.

Mass. Inst. of Tech. v. Mass. Dep't of Pub. Util. ("MIT"), 941
F. Supp. 233, 237 (D. Mass. 1996).  "Because the jurisdictional
grant in § 210(h) of PURPA extends only to cases in which a
federal court is asked to require a state agency . . . to
implement, federal courts have refused to hear as-applied
claims."  Id. (citing Greensboro Lumber Co. v. Ga. Power Co.,
643 F.Supp. 1345, 1374 (N.D. Ga. 1986), aff'd 844 F.2d 1538,
1542 (11th Cir. 1988) ("The district court held that it lacked

subject matter jurisdiction over Greensboro's 'as applied'
claim, and we find its reasoning persuasive.")).


          In arguing that the pending action is an "as applied"
challenge, the defendants rely on Greensboro Lumber and MIT.
The court observes that the instant case differs from those "as
applied" cases in that the complaint alleges an impermissible
modification of preexisting EEPAs that would broadly affect all
West Virginia QFs.  In Occidental Chemical Corp., the district
court distinguished Greensboro Lumber and MIT on grounds that
are equally apt in this case.  See 494 F. Supp. 2d at 410
("Inasmuch as the Greensboro Lumber Co. court relied upon the
allegation that the non-regulated utility violated PURPA as-
applied to the plaintiff alone, the case is distinguishable.  In
the case sub judice, neither Carville nor Occidental allege that
the [state regulatory] order violates PURPA as-applied to either
plaintiff alone."); id. ("Like Greensboro Lumber Co., Mass.
Inst. of Tech. is distinguishable because neither Carville nor
Occidental allege that either is the only QF subjected to the
new methodology for calculating avoided cost.  To the contrary,
Occidental alleges that 'the [state regulator's] failure to
implement PURPA is demonstrated by the broad scope of entities
to whom the [state regulator's] Order applies . . . .'").  The
Commission Order sets forth a rule that broadly applies to PURPA
QFs and that is allegedly "inconsistent with or contrary to

[FERC's] regulations." Policy Statement, 23 F.E.R.C. at
¶ 61644.  The Commission Order does not relate to a "particular
qualifying facility," Greensboro Lumber, 643 F. Supp. at 1374,
and the court is satisfied that this action is not an "as
applied" challenge.


C. Abstention

        The defendants argue that this court should abstain
from adjudicating the City's claims under the Burford, Princess
Lida, Colorado River, and Younger abstention doctrines[9] because
the claims have already been adjudicated in state proceedings
before the Commission and the West Virginia Supreme Court of
Appeals.  Comm'n's Mem. Supp. Mot. Dismiss 21; Utilities' Mem.
Supp. Mot. J. Pleadings 3, 24-25.  The defendants' arguments for
why this court should abstain fail.

---

[9] The Utilities additionally raise the argument that Pullman
abstention applies.  See R.R. Comm'n of Texas v. Pullman Co.,
312 U.S. 496 (1941).  Utilities' Mem. Supp. Mot. J. Pleadings
24; Utilities' Reply Supp. Mot. J. Pleadings 16.  However,
because the Utilities devote less than two full sentences to
this argument between both their Memorandum in Support of their
Motion for Judgment on the Pleadings and their Reply, the court
concludes that the argument is not seriously raised.  In any
event, abstention is not warranted under Pullman.  Pullman
abstention may be warranted when there is a possibility that the
federal court can avoid deciding a constitutional issue by
permitting a state court to rule on the matter.  Here, the state
court has already made a decision, so Pullman is inapplicable.
See See England v. Louisiana State Bd. of Medical Examiners, 375
U.S. 411, 416 n.7 (1964); R.R. Comm'n of Texas v. Pullman Co.,
312 U.S. 496, 501 (1941).

1. <u>Burford</u> Abstention

Two situations merit abstention under the doctrine

espoused in <u>Burford</u>:

> (1) [W]hen there are difficult questions of state law
> bearing on policy problems of substantial public import
> whose importance transcends the result in the case then at
> bar; or (2) where the exercise of federal review of the
> question in a case and in similar cases would be disruptive
> of state efforts to establish a coherent policy with
> respect to a matter of substantial public concern.

<u>Town of Nags Head v. Toloczko</u>, -- F.3d --, 2013 WL 4517074 at *3

(4th Cir. 2013)(quoting <u>New Orleans Pub. Serv., Inc. v. Council</u>

<u>of City of New Orleans</u>, 491 U.S. 350, 361 (1989)).  In their

briefing on abstention, the defendants do not state what

important difficult questions of state law still remain, nor do

they state how the exercise of federal review would be

disruptive of West Virginia's efforts to establish coherent

policy, other than that it would be "vexatious".  Comm'n's Reply

Pl.'s Resp. Mot. Dismiss 16.  For this reason alone, abstention

is not warranted.


Moreover, the state court proceedings have already

come to a close and contested state law issues have been

decided.[10]  The Commission nevertheless contends that an ongoing

---

[10] <u>Compare</u> <u>Aluminum Co. of America v. Utilities Comm'n of the</u>
<u>State of North Carolina</u>, 713 F.2d 1024, 1029 (4th Cir. 1983)
(abstention under <u>Burford</u> permissible when a state commission's
order is still pending on appeal) <u>with</u> <u>Nags Head</u>, 2013 WL

state proceeding is not necessary to abstain under <u>Burford</u>, but only the <u>availability</u> of state court review on an important issue is necessary.  In support, it cites <u>Alabama Public Service Commission v. Southern Ry. Co.</u>, 341 U.S. 341 (1951).

In that case, a railway company challenged a state administrative order "designed to assure the provision of adequate intrastate service by utilities operating within" the state, alleging that the losses that accrued because the commission order required continued operation of railways in Alabama was a confiscation of property in violation of the Fourteenth Amendment.  <u>Id.</u> at 343-344.  Rather than appealing in the state courts, the company sued in federal district court. The United States Supreme Court determined that a state court appeal from an order of the commission was an "integral part of the regulatory process under the Alabama Code."  <u>Id.</u> at 348. The Court emphasized that the "[Southern Railway Co.] complains of irreparable injury resulting from the Commission order pending judicial review, but has not invoked the protective powers of the Alabama courts to direct the stay or supersedeas of a Commission order pending appeal."  <u>Id.</u> at 349.

---

4517074 at *5 ("[B]ecause the balance of federal and state interests has changed with intermediate developments in state court precedent, 'continued abstention at this point would be inappropriate.' (quoting <u>Front Royal and Warren County Indus. Park Corp. v. Town of Front Royal, Va.</u>, 135 F.3d 275, 283 (4th Cir. 1998))).

This case is quite unlike <u>Alabama Public Service Commission</u>.  Here, the City has appealed the Commission's ruling to West Virginia's highest court, and the Commission has obtained an adjudication in its favor on the contested issues of state law regarding ownership of the credits.  The state regulatory process is not in limbo, because West Virginia's highest court has spoken on the matter.  See <u>Colorado River Water Conservation Dist. v. United States</u>, 424 U.S. 800, 815 (1976) ("The present case clearly does not fall within [the <u>Burford</u>] category of abstention.  While state claims are involved in this case, the state law to be applied appears to be settled.")  Also, the claims in <u>Alabama Public Service Commission</u> concerned intrastate regulation of railroads, a matter the Court considered to be "essentially local," unlike PURPA, which creates a web of interlocking state and federal regulatory schemes.  <u>Alabama Public Service Commission</u>, 341 U.S. at 347; <u>see</u> <u>Colorado River</u>, 424 U.S. at 815-816.  Abstention under <u>Burford</u> is not warranted.

### 2. <u>Princess Lida</u> Abstention

Our Court of Appeals has succinctly described the <u>Princess Lida</u> doctrine:

> [A] federal court may not exercise jurisdiction when
> granting the relief sought would require the court to

control property over which another court already has
jurisdiction.

Gannett Co., Inc. v. Clark Const. Group, Inc., 286 F.3d 737, 747
n. 9 (4th Cir. 2002) (citing Al-Abood v. El-Shamari, 217 F.3d
225, 232 (4th Cir. 2000)).  The defendants argue that the
plaintiff asks for this court to exercise jurisdiction over
RECs, property over which the Supreme Court of Appeals in New
Martinsville and the Commission have already exercised control.
Comm'n's Mem. Supp. Mot. Dismiss 23.  Setting aside the
important distinction that the case in state court has been
resolved, and thus no state judicial body is currently
exercising jurisdiction over the property, the plaintiffs
notably do not request that the court take control of the
credits.  Rather, the plaintiffs ask the court for a declaration
of its rights and an injunction enjoining the Commission from
enforcing the Commission Order.  Am. Compl. ¶¶ 85, 88, 94.
Inasmuch as control over the property is not sought, the court
declines to abstain under the Princess Lida doctrine.


### 3. Colorado River Abstention

A court will abstain under Colorado River "in favor of
ongoing, parallel state proceedings in cases where
'considerations of wise judicial administration, giving regard
to conservation of judicial resources and comprehensive
disposition of litigation' clearly favor abstention."  Ackerman

v. ExxonMobil Corp., -- F.3d --, 2013 WL 4008699, at *3 (4th

Cir. 2013) (quoting Colorado River Water Conservation District

v. United States, 424 U.S. 800, 817 (1976)).  "The threshold

question in a Colorado River inquiry is whether the pending

state and federal suits are parallel."  Id.  The state

proceedings have been resolved.  They are not ongoing and,

hence, not parallel with the current suit.  Indeed, because the

Supreme Court of Appeals has issued its judgment, the better

approach is to examine that judgment for its preclusive effect.

See Gannet, 286 F.3d at 746 ("[R]es judicata effect will be

given to whichever judgment is rendered first."); see also

Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 713 (1996) (a

stay order under Colorado River amounts to a refusal to

adjudicate because the federal court is bound as a matter of res

judicata to honor the state court judgment).  Abstention under

Colorado River is not warranted.


### 4. Younger Abstention

Once again, the absence of an ongoing state proceeding is

determinative.  As our Court of Appeals observed in Harper:

> Younger abstention originated as a doctrine requiring
> federal courts not to interfere with ongoing state criminal
> proceedings.  The Supreme Court has since made clear,
> however, that it applies as well to noncriminal judicial
> proceedings when important state interests are involved.
> Criminal proceedings are, perhaps, the most obvious example
> of the states' sovereign authority to perform their
> separate functions in their separate ways.  But other state

functions also lie at the heart of the states' identity under the Constitution.  In <u>Middlesex County</u>, the Court listed three questions which must be answered in the affirmative for a case to merit abstention under <u>Younger</u>:

> <u>first</u>, do [the state proceedings] constitute an ongoing state judicial proceeding; <u>second</u>, do the proceedings implicate important state interests; and <u>third</u>, is there an adequate opportunity in the state proceedings to raise constitutional challenges.

<u>Harper v. Public Service Comm'n of West Virginia</u>, 396 F.3d 348, 351-352 (4th Cir. 2005)(quoting <u>Middlesex County Ethics Comm. v. Garden State Bar Ass'n</u>, 457 U.S. 423, 432 (1982)) (internal quotation marks and citations omitted).  There is no ongoing state judicial proceeding.  Consequently, the first requirement of <u>Younger</u> is not met and this court declines to abstain.  <u>See</u> <u>United States v. South Carolina</u>, 720 F.3d 518, 527 (4th Cir. 2013).


D. Sovereign Immunity

        The Public Service Commission filed its Motion to Dismiss before the amended complaint was filed and the individual Commissioners were parties to this action.  That motion has since been adopted by the Commissioners, Comm'rs' Mot. Dismiss 2.  The Commission itself also filed notice with the court that it elects to stand on the arguments filed in its motion to dismiss.  Comm'n's Notice, June 4, 2013.  The Commission argues that Congress did not abrogate its Eleventh Amendment sovereign immunity, and that it has not consented to

suit. Comm'n's Mot. Dismiss 19-20. The City responds that by amending its complaint and naming the individual Commissioners in their official capacities, the case is brought within the sovereign immunity exception of Ex parte Young, 209 U.S. 123 (1908), which allows prospective injunctive relief against state officials sued in their official capacity in spite of any sovereign immunity. The City adds that (1) it is not clear that the City is a "citizen" within the meaning of the Eleventh Amendment because it is a municipality, and (2) sovereign immunity was abrogated by the West Virginia legislature when it provided that "[t]he Public Service Commission may sue and be sued in that name," W. Va. Code §24-1-3(a), and when it empowered municipalities to "institute, maintain and defend any civil action or other proceeding in any court." W. Va. Code §8-12-1. Neither the Commission nor the Commissioners responds to the City's contentions.

Although the Commissioners adopt the Commission's motion and brief, those documents relate only to sovereign immunity of the Commission, not the Commissioners.[11] The Commissioners make no other sovereign immunity arguments, and, thus, the Commissioners do not assert a defense of sovereign

---

[11] Nor is the court required to inquire as to the Commissioners' sovereign immunity sua sponte. See Wisconsin Dept. of Corrections v. Schacht, 524 U.S. 381, 389 (1998).

immunity.  Yet, the claims asserted against the Commission and
the Commissioners are identical.  If the court were to determine
that the Commission was immune from suit, it has no occasion to
consider the Commissioners immune.  Because the court concludes
that the entire action should be dismissed as against all
defendants on other grounds, there is no need to engage in this
bifurcated sovereign immunity analysis, and the court declines
to do so.


E. Res Judicata and Collateral Estoppel

        The defendants assert that res judicata and collateral
estoppel bar the City's complaint because the issues have been
fully litigated within the Commission's proceeding and the state
court appeal.


        The Full Faith and Credit Act, 28 U.S.C. § 1738
requires the federal court to "give the same preclusive effect
to a state-court judgment as another court of that State would
give."  Parsons Steel, Inc. v. First Ala. Bank, 474 U.S. 518,
523 (1986).  The application of preclusion principles is subject
to a two-part inquiry:

        First, a federal court must look to state law to determine
        the preclusive effect of the state court judgment.  If
        state law would not bar relitigation of an issue or claim
        decided in the earlier proceeding, then the inquiry ends --
        a federal court will not give the state court judgment
        preclusive effect either.  If state law would afford the

judgment preclusive effect, however, then a federal court
must engage in a second step -— it must determine if
Congress created an exception to § 1738.  Only if "some
exception to § 1738 applie[s]" can a federal court refuse
to give a judgment the preclusive effect to which it is
entitled under state law.  An exception "will not be
recognized unless a later statute contains an express or
implied partial repeal" of § 1738.

In re Genesys Data Techs., Inc., 204 F.3d 124, 128 (4th Cir.

2000) (citations omitted); see also Jaffe v. Accredited Sur. and

Cas. Co., 294 F.3d 584, 590 (4th Cir.2002).


        Under the relevant state law, res judicata prevents

relitigation when three elements are satisfied:

        First, there must have been a final adjudication on the
        merits in the prior action by a court having jurisdiction
        of the proceedings.  Second, the two actions must involve
        either the same parties or persons in privity with those
        same parties.  Third, the cause of action identified for
        resolution in the subsequent proceeding either must be
        identical to the cause of action determined in the prior
        action or must be such that it could have been resolved,
        had it been presented, in the prior action.

Blake v. Charleston Area Med. Ctr., Inc., 498 S.E.2d 41, 49 (W.

Va. 1997) (quoting Hannah v. Beasley, 53 S.E.2d 729, 732 (W. Va.

1949)).  The West Virginia Supreme Court of Appeals has further

expounded on what constitutes the same cause of action in the

res judicata context:

        "[F]or purposes of res judicata, 'a cause of action' is the
        fact or facts which establish or give rise to a right of
        action, the existence of which affords a party a right to
        judicial relief.  . . .  The test to determine if the . . .
        cause of action involved in the two suits is identical is
        to inquire whether the same evidence would support both
        actions or issues.  . . .  If the two cases require
        substantially different evidence to sustain them, the

> second cannot be said to be the same cause of action and
> barred by res judicata."

Id. at 48 (quoting White v. SWCC, 262 S.E.2d 752, 756 (W. Va.

1980)).  For res judicata to be applicable, a prior adjudication

need not have formally and directly addressed a matter:

> "[A]n adjudication by a court having jurisdiction of the
> subject-matter and the parties is final and conclusive, not
> only as to the matters actually determined, but as to every
> other matter which the parties might have litigated as
> incident thereto and coming within the legitimate purview
> of the subject-matter of the action.  It is not essential
> that the matter should have been formally put in issue in a
> former suit, but it is sufficient that the status of the
> suit was such that the parties might have had the matter
> disposed of on its merits."

Id. (quoting Syl. Pt. 1, Conley v. Spillers, 301 S.E.2d 216, 217

(W. Va. 1983)).


> For administrative agency decisions, the preclusion

rule is derived from Page v. Columbia Natural Resources, Inc.

and provides as follows:

> An assessment of three factors is ordinarily made in
> determining whether res judicata and collateral estoppel
> may be applied to a hearing body: (1) whether the body acts
> in a judicial capacity; (2) whether the parties were
> afforded a full and fair opportunity to litigate the
> matters in dispute; and (3) whether applying the doctrines
> is consistent with the express or implied policy in the
> legislation which created the body.

480 S.E.2d 817, 831 (W. Va.) (quoting Syl. Pt. 3, Mellon-Stuart

Co. v. Hall, 359 S.E.2d 124, 126 (W. Va. 1987)).

One need not pause to consider whether the proceedings that culminated in the Commission Order met this test. According preclusive effect to the Commission Order would be inconsistent with the framework through which the court conducts its review, inasmuch as Section 210(h) gives the court jurisdiction to review regulatory authority decisions for compliance with PURPA implementation rules.  Barring review due to the Commission's own proceedings would significantly impair the court's ability to carry out that congressionally granted function.

The court, however, concludes that the Supreme Court of Appeals' decision in New Martinsville bars relitigation of the City's claims.  First, New Martinsville was a final adjudication on the merits by a court having jurisdiction of the proceedings.  Blake, 498 S.E.2d at 49.  The high court affirmed the Commission's order as consistent with both PURPA and state law.  New Martinsville, 729 S.E.2d at 196-97, 199 ("[W]e find no merit to the arguments asserted by the Generators and, therefore, the decision of the Commission finding that the credits at issue are owned by the Utilities is affirmed.").  As expressly recognized by FERC, the high court had jurisdiction to consider PURPA implementation claims:

> [T]he Commission [(FERC)] believes that its jurisdiction to
> review and enforce the section 210(f) implementation
> requirement (i.e., the requirement that State regulatory

authorities . . . promulgate rules consistent with the
requirements established by this Commission under section
210(a) of PURPA) is not exclusive.  In fact, we would
anticipate that generally proceedings would be initiated at
the State level.

Policy Statement, 23 F.E.R.C. ¶ 61,304, at ¶ 61,664; see also

Rainbow Ranch Wind, LLC & Rainbow West Wind, LLC, 139 F.E.R.C. ¶

61,304 ("Section 210(g) and section 210(h) of PURPA provide for

separate state and federal rights to challenge a state's

implementation of PURPA.  A state's implementation of PURPA and

the Commission's rules implementing PURPA may be challenged

either through the state courts under section 210(g) of PURPA,

or separately at the Commission under section 210(h) of PURPA,

or both.").


          The second element required for applying preclusion is

satisfied since, in both this case and New Martinsville, the

City is challenging the Commission Order and the Public Service

Commission and the Utilities are defending.  See Blake, 498

S.E.2d at 49.  While the individual Commissioners were not

parties to New Martinsville, the City does not assert that the

Commissioners were not in privity with the Public Service

Commission.  Indeed, the Commissioners, sued here in their

official capacity, are in privity with the Public Service

Commission.  While the West Virginia cases are relatively silent

on the matter, there exists other persuasive authority on the

issue.  See, e.g., Tait v. Western Maryland R. Co., 289 U.S. 620

(1933) (tax collector in privity with Commissioner of Internal
Revenue); Mears v. Town of Oxford, Md., 762 F.2d 368, 371 n.3
(4th Cir. 1985) (applying Maryland law).


Finally, the causes of action identified for
resolution in this action are identical to the causes of action
determined in New Martinsville, or such that they could have
been resolved, had they been presented. See id. The West
Virginia Supreme Court of Appeals addressed and rejected the
City's Count I argument that the Commission violated PURPA by
improperly modifying the EEPAs: "the Commission has not modified
the terms of the existing EEPAs but, instead, has only
determined ownership of assets -- the credits -- which were not
contemplated and, thus, not provided for in the EEPAs." New
Martinsville, 729 S.E.2d at 196.


The same discussion also addresses the City's Count II
preemption claim, which arises from the allegedly improper
modification. Count II alleges that the Commission's "finding
that avoided cost rates for energy and capacity also compensate
QFs for RECs constitutes a past and continuing violation of the
Supremecy Clause of the United States Constitution." Am. Compl.
¶ 92. Notably, the high court addressed this issue. It
recognized that modifying the EEPA is something the Commission
cannot do under § 210(e) of PURPA, citing Freehold, 44 F.3d at

1192; and it concluded that the Commission's actions were not preempted because the Commission did not modify the terms of the EEPA.  New Martinsville, 729 S.E.2d at 196.


The City further claims that an exception to the ordinary operation of res judicata applies.  It asserts that its implementation claim is subject to the exclusive jurisdiction of the federal courts, and, because that claim can never be heard in a state court, that res judicata should not apply.  Having already determined that the federal courts do not have exclusive jurisdiction over the City's implementation claim, this argument fails.

Accordingly, res judicata applies to both counts brought by the City in its amended complaint, and bars them from relitigation in this court.


F. Sufficiency of the Claims

Apart from the application of res judicata, the court agrees with the Utilities assertion that, when taking the alleged facts in the light most favorable to the City, the City's claims still fail as a matter of law.

1. Count I: Violation of PURPA

Count I alleges the Commission Order violates PURPA and FERC's regulations implementing PURPA by unlawfully "ruling that a purchaser's payment of avoided cost rates under PURPA also compensates a QF for RECs."  Am. Compl. ¶ 85.

The Utilities seek dismissal on the ground that the Commission Order was purely a matter of state law and did not violate PURPA.[12]  They argue that the Commission Order assigns credits based exclusively on state law authority, consistent with American Ref-Fuel.  The basis for the decision, the Commission states, was the assessment of the Portfolio Act's policy goals and the determination that granting credits to the generators would be an "un-bargained for windfall" for the generator and would be "unfair to the utilities and rate-paying public."  Comm'n Reply Pl.'s Resp. Mot. Dismiss 6.

The court agrees with the Supreme Court of Appeals' reasoning in New Martinsville.  There, the high court found that the Commission, in accordance with the legislative intent of the Portfolio Act and its statutory charge to balance the interests

---

[12] The Commission raised these arguments in the jurisdictional context, but the court, for reasons discussed above, finds it more appropriate to consider the arguments with respect to the merits.

of the utilities, the public, and the state's economy in making
its assessment, "concluded that the public interest favored
awarding ownership of the credits to the Utilities."  New
Martinsville, 729 S.E.2d at 198.  Thus, the Commission's
determination is consistent with FERC's guidance in American
Ref-Fuel that a state regulator should "find its authority [for
assigning RECs] in state law, not PURPA."  105 F.E.R.C. ¶
61,007, at ¶ 24.  Other courts have noted and approved similar
public policy grounds for assigning RECs.  See Ownership of
RECs, 913 A.2d 825, 830 (N.J. Super. Ct. App. Div. 2007) ("[A]s
the [state regulator] concluded, assignment of the Renewable
Energy Certificates to appellants necessarily would have meant
that retail consumers would have had to pay more for
electricity.  This result would be unfair to retail consumers,
who have already paid for appellants' electricity, and is
entirely inconsistent with the governing state legislation.");
ARIPPA v. Pa Pub. Util. Comm'n, 966 A.2d 1204, 1214 (Pa. Commw.
Ct. 2009) (accepting the state regulator's "conclu[sion] that
the public interest favored awarding ownership rights in the
credits to the distribution company" where there was "no
controlling statutory language in the applicable version of [the
state portfolio standards act], no controlling precedent, and no
guiding language in the contracts themselves").

The Commission Order does not conclude, as proscribed by American Ref-Fuel, that the avoided cost rate inherently compensates for more than capacity and energy.  As the Supreme Court of Appeals observed, the Commission "only interpreted the EEPAs to evaluate the Utilities' obligations under them and their ownership of the electricity at the time it is generated." New Martinsville, 729 S.E.2d at 196.  It did not "interfere[] with the Generators' federally-granted right to be exempt from certain utility-type state regulation."  Id. at 196-97.

In implementing the Portfolio Act, the Commission necessarily had to consider the circumstances surrounding the PURPA EEPAs -- agreements that are directly relevant to the Portfolio Act's policy goals of providing renewable energy at reasonable prices.  Id. 198-99 ("The purpose of the Portfolio Act is to encourage the creation and use of energy from alternative sources of energy.  West Virginia Code § 24-2F-2(7) (Repl.Vol.2008 & Supp.2011) states: 'It is in the public interest for the state to encourage the construction of alternative and renewable energy resources facilities that increase the capacity to provide for current and anticipated electric energy demand at a reasonable price.'").  The Commission's finding that PURPA EEPAs are generous and require no additional consideration is merely an assessment of policy concerns.  It does not signify a belief that the EEPAs

"inherently" convey RECs.  See 105 F.E.R.C. ¶ 61,005, at ¶ 2.
The Commission Order is not based on PURPA and does not modify
the EEPA's avoided cost rates.


        The City contends that this court is obligated to
defer to FERC's April and September orders declaring the
Commission Order to be "inconsistent with PURPA," 139 F.E.R.C. ¶
61,066 at ¶ 47, and "inconsistent with [FERC's] ruling in
American Ref-Fuel that avoided cost rates 'in short, are not
intended to compensate the QF for more than capacity and
energy,'"  140 F.E.R.C. ¶ 61,223 at ¶ 21.  Am. Compl. ¶ 86.  As
the defendants emphasize, FERC's conclusions are not binding
upon this court, though the court does consider FERC's studied
and informed pronouncements respectfully.  FERC's opinion that
the Commission Order in one respect is inconsistent with PURPA
does not diminish the determination of the Commission and the
West Virginia Supreme Court that the Commission's conclusion,
that the RECs at issue belong to the Utilities, is based on
state law.  Having determined that Count I does not assert a
cognizable violation of PURPA, the court concludes that the City
is not entitled to declaratory or injunctive relief.


        2.  Count II: Federal Preemption

        Count II asserts that the Commission Order is
preempted by federal law in that it is contrary to and

57

inconsistent with the Commission's PURPA § 210(f) implementation requirement.  Am. Compl. ¶ 91.


     As stated by the Second Circuit in <u>Wheelabrator</u>, "The FERC decision in <u>American Ref-Fuel</u> does not evince an intent to occupy the relevant field - namely, the regulation of renewable energy credits.  Rather, it explicitly acknowledges that state law governs the conveyance of RECs."  531 F.3d at 190.  This court has concluded that West Virginia state law -- particularly the W.Va. Portfolio Act -- appropriately governed the Commission's conveyance of RECs.  The Commission Order is consistent with PURPA, and the City has failed to state grounds for its preemption claim.  The City is not entitled to declaratory or injunctive relief based on preemption.

IV.

It is, accordingly, ORDERED as follows:

1.     The Commission's motion to dismiss, filed January 25, 2013, be, and it hereby is, granted;

2.     The Utilities' motion for judgment on the pleadings, filed January 25, 2013, be, and it hereby is, granted;

3.     The individual Commissioners' motion to dismiss, filed June 28, 2013, be, and it hereby is, granted; and

4.     This action be, and it hereby is, stricken from the docket.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: September 30, 2013

John T. Copenhaver, Jr.
United States District Judge